**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY KIYABU, individually and on behalf of all others similarly situated, | Case No.  5:25-cv-02774 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| GLOBAL FEDERAL CREDIT UNION, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Randy Kiyabu ("Plaintiff") brings this action individually and on behalf of all others similarly situated ("Class Members") against Global Federal Credit Union ("Defendant" or "GCU").  Plaintiff's allegations are based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.     This is a class action lawsuit brought on behalf of all GCU account holders who have accessed and used www.globalcu.org (the "Website") to apply for a loan or credit card.

2.     Defendant provides financial services to consumers through the Website it maintains, where GCU account holders can manage and apply for credit cards, loans, and select payment plans.  To apply for one of Defendant's financial products, users must share personally identifying information, including their citizenship status and loan application status.  When consumers provide this information on their applications, they expect that such confidential information and activity will be protected and not disclosed to unknown third parties.  Such expectations are based, in part, on the legal protections afforded to such information.

3.     Despite reasonable expectations of privacy, and Defendant's legal duties to prevent the disclosure of such private information, Defendant discloses information provided by consumers on loan and credit card applications to LinkedIn Corporation ("LinkedIn").  These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA") and Cal. Fin. Code § 4050, et seq. (the "California Financial Information Privacy Act" or "CalFIPA").

4.     Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA") and the California

Invasion of Privacy Act ("CIPA") §§ 631 and 632 by disclosing Plaintiff's and Class Members' private and confidential information without consent.

## PARTIES

5.      Plaintiff Randy Kiyabu is a resident and citizen of Victorville, California.  On or around February 2025, Plaintiff applied for an unsecured loan and credit card through the Website.  During the application process, Defendant required Plaintiff to provide private information, including information related to his citizenship and housing status.  Plaintiff applied for an unsecured loan and credit card through the Website using the same device and browser used to access his LinkedIn account.  When creating his LinkedIn account, Plaintiff provided certain information to LinkedIn, including his full name.  Unbeknownst to Plaintiff, Defendant disclosed his personally identifiable information ("PII") to LinkedIn, as well as communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA and CalFIPA.  Neither Defendant nor LinkedIn procured Plaintiff's prior consent to the sharing of his private and protected information.

6.      Defendant Global Federal Credit Union is an Alaska corporation with its principal place of business at 4000 Credit Union Drive, Anchorage, Alaska 99503.  Defendant is a provider of financial products and services including bank accounts, credit cards, and loans, to individuals in several states, including in California.  Defendant also provides a variety of financial services to Californians, whom it knows to reside in the State based on address information that individuals must provide in order to open an account or apply for a financial product or service with GCU.  Defendant chose to embed the LinkedIn Insight Tag on its Website, which it owns and operates.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2

Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

8.      This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court. Further, the Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout California. Additionally, Plaintiff, while in California, applied for a loan through Defendant's Website.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant transacts significant business within this District, Plaintiff resides in this District, and the acts that gave rise to this cause of action occurred within this District.

## FACTUAL BACKGROUND

### I.      The California Invasion of Privacy Act

10.      The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

11.      The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation

where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

12.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added, internal citations omitted).

13.    As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

14.    CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

15. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

16. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

17. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. The Gramm-Leach-Bliley Act and California Financial Information Privacy Act

18. As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

19. Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i) Personally identifiable financial information; and

(ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

20. Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i) A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)    About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A)    Information a consumer provides to [a financial institution]on an application to obtain a loan, credit card, or other financial product or service;

(B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

(D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E)    Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F)    Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

21.    Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C.

1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

22. Pursuant to 16 C.F.R. § 313.3(k)(1), GCU is a financial institution.

23. In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

24. Cal. Fin. Code § 4052(a) provides that:

> "Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

25. According to Cal. Fin. Code § 4052(b):

> "Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:
>
> (2) Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3)   The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)   Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)   Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6)   Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

26.   "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

27.   Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under both federal and California law.  Nonetheless, such information was intercepted in transit by the LinkedIn Insight Tag—as enabled by Defendant— and none of the parties, Defendant nor LinkedIn, procured Plaintiff's and Class Members' consent prior to this interception.

28.   This pattern of conduct by Defendant flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[1]

## III.   Overview of Defendant's Website

29.   Defendant owns and operates the Website.  Unbeknownst to consumers,

---

[1] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

Defendant has integrated the LinkedIn Insight Tag wiretap into the Website to assist with its marketing efforts.

30.   On the Website, users can, *inter alia*, search for and apply for financial products and services, including credit cards and loans.  When doing so, Website users provide Defendant with confidential information, including "nonpublic personal information" under the GLBA and CalFIPA, such as their PII (*e.g.* their citizenship status) and information about their financial activity with GCU (*e.g.* application status).

31.   Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables LinkedIn's Insight Tag to eavesdrop on those confidential communications.

32.   Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections.  All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

**IV.    Defendant Discloses Consumers' Private Information Through LinkedIn's Insight Tag**

**A.    LinkedIn's Platform and Business Tools**

33.    LinkedIn markets itself as "the world's largest professional network on the internet[.]"[2]   But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network.  LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[3] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[4]

34.    According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [5]   Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[6]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[7]

---

[2] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[3] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[4] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[5] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[6] LINKEDIN, *supra* note 33.

[7] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                               10

35.     As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[8]

36.     The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[9]

37.     Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[10]

38.     For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[11] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like

---

[8] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[9] *See id.*

[10] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[11] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                          11

LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[12]

39. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[13] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[14]

40. According to LinkedIn, the LinkedIn Insight Tag, also called the Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[15] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[16]

41. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[17] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[18] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions

---

[12] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[13] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[14] Dencheva, *supra* note 34.

[15] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[16] LINKEDIN, LINKEDIN INSIGHT TAG FAQs, https://www.linkedin.com/help/lms/answer/a427660.

[17] LINKEDIN, *supra* note 45.

[18] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    12

API" because third-party cookie settings are being deprecated across the industry.[19] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its Pixel.[20] Instead, the LinkedIn Pixel is shielded with the same privacy exemptions offered to first-party cookies.

42. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

43. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

44. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[21]

45. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[22] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[23]

46. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based

---

[19] See id.

[20] See id.

[21] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[22] See id.

[23] See id.

on information it obtains through the LinkedIn Pixel, Defendant LinkedIn is able to target its account holders for advertising.

47.    LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information.  In fact, LinkedIn expressly warrants the opposite.

48.    When first signing up, a user agrees to the User Agreement.[24]  By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[25] and the Cookie Policy.[26]  For California residents, LinkedIn also publishes a California Privacy Disclosure.[27]

49.    LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[28]

50.    The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[29]  LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[30]

51.    However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[31]

---

[24] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[25] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[26] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[27] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

[28] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[29] Id.

[30] Id.

[31] Id. (emphasis added).

52.    Despite this explicit representation, LinkedIn intentionally intercepts and receives sensitive and unlawfully disclosed information in violation of state and federal privacy laws.

53.    Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**B.    How Defendant Disclosed Plaintiff's and Class Members' Protected Personally Identifiable Information and Financial Information Through the LinkedIn Insight Tag**

54.    Defendant GCU is a corporation that focuses on providing financial services, such as loans and credit cards.

55.    GCU owns and operates the Website, where it encourages prospective customers to apply for its financial products and services.

56.    At all relevant times Defendant's Website utilized the LinkedIn Insight Tag.

57.    Through the LinkedIn Insight Tag, Defendant shared its applicants' identities and online activity, including information related to consumers seeking to procure financial products and/or services, with one of the world's largest social media companies for targeted advertising purposes.

58.    Defendant allows and encourages consumers to apply for financial services on its Website.  Consumers can click "Loans" to explore loan services. Once a consumer clicks "Loans", GCU discloses the fact that the consumer is seeking loan services to LinkedIn.

**Figure 1:**



**Figure 2:**

59.    After a consumer clicks the "Loans" link, they are brought to a new page and prompted to select a loan type, such as "Vehicle Loans".

**Figure 3:**



60.     Next, consumers are brought to the following webpage to select what type of vehicle loan they would like to apply for.  Defendant provides some recommended loan types, such as "Auto Loans".

**Figure 4:**



61.    Next, the consumer is brought to a new page where they are prompted to "Apply Now".  After a consumer clicks "Apply Now", Defendant discloses the fact that the consumer has begun an application for a vehicle loan, and more specifically an auto loan, to LinkedIn.

**Figure 5:**



**Figure 6:**

▾ Request Payload       View source
  ▾ {pids: [6225721], scriptVersion: 230, time: 1750864104599, domain: "globalcu.org",…}
    ▾ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "A",…}
        backgroundImageSrc: null
        cursor: "pointer"
        elementSemanticType: null
        elementTitle: "Apply now"
        elementType: null
        elementValue: null
        imageAlt: null
        imageSrc: null
        innerText: "Apply now"
        tagName: "A"
      domain: "globalcu.org"
    ▸ elementCrumbsTree: [{tagName: "div", nthChild: 3, id: "push"}, {tagName: "div", nthChild: 3, id: "page"},…]
      hem: null
      href: "https://apply.globalcu.org/vl/vehicleloan.aspx?lenderref=ALASKAUSA060523&referralsource=Online&branchid=0b74c2fceccb4f958ddddf08c59555a5"
      innerElements: null
      isFilteredByClient: false
      isLinkedInApp: false
      isTranslated: false
      liFatId: ""
      liGiant: ""
    ▸ misc: {psbState: -4}
      pageTitle: "Auto loans | Global Credit Union"
    ▸ pids: [6225721]
      scriptVersion: 230
      signalType: "CLICK"
      time: 1750...
      url: "https://globalcu.org/loans/vehicle-loans/auto-loans/"
      websiteSignalRequestId: 3f5656e5-a0d3-eef1-04ae-40a7535fd377"

62.    Next, consumers are brought to a new page where they fill out information related to the vehicle they are seeking a loan for. Consumers must first select the purpose of their loan. Once a consumer selects a purpose such as "Dealer

Purchase" for example, Defendant discloses the fact that they are seeking an auto loan for a dealer purchase to LinkedIn.

**Figure 7:**



**Figure 8:**

```
▼Request Payload    (View source)
  ▼{pids: [6225721], scriptVersion: 230, time: 1750799730485, domain: "apply.globalcu.org",…}
    ▼domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "A",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: "Dealer Purchase"
      tagName: "A"
    domain: "apply.globalcu.org"
    ▶elementCrumbsTree: [{tagName: "div", nthChild: 110, classes: ["ui-mobile-viewport"]},…]
    hem: null
    href: "#"
    innerElements: null
    isFilteredByClient: false
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
    ▶misc: {psbState: -4}
    pageTitle: "Vehicle Loan Information"
    ▶pids: [6225721]
    scriptVersion: 230
    signalType: "CLICK"
    time: 1750799730485
    url: "https://apply.globalcu.org/vl/vehicleloan.aspx?enc=Kw21Wblm1yxpjJabdoZaD6B3tjepbUE8KvVcPEXw1P_sL3LxwrdpTyhlHbQBl5QAVyGMkAlDEHiqEdSTFYCN5KkQhynoPWmeMu4
    websiteSignalRequestId: "369b5c9a-62bb-0f20-b985-4961e843e71e"
```

63.    Consumers are asked other questions about the vehicle, such as if it is new or used. After selecting one of the options, such as "New," Defendant discloses the fact that the consumer is seeking an auto loan for a new car to LinkedIn.

**Figure 9:**



**Figure 10:**



64.    Next, consumers are brought to a webpage where they are prompted to input personal information, such as their citizenship status. After selecting "US CITIZEN," for example, Defendant discloses the consumer's citizenship status to LinkedIn.

**Figure 11:**



**Figure 12:**



65.     Defendant also prompts consumers to select whether they have a co-applicant.  After a consumer selects "No" for example, Defendant discloses the fact that the consumer does not have a co-applicant to LinkedIn.

**Figure 13:**



**Figure 14:**

66.     After providing the remainder of their personal information, the consumer submits their application. Upon submission of their application, Defendant discloses the fact that the consumer has submitted the application to LinkedIn.

**Figure 15:**

67. Defendant intercepts and discloses other private information during the application process, including information related to applicants' housing status:

**Figure 16:**

68.     Each of these interceptions were accompanied by the li_sugr and lms_ads cookies.

69.     The information disclosed by Defendant allows LinkedIn to know the identities of specific individuals as well as information related to the financial services they are receiving.  This allows these companies, including Defendant, to profit from this information for targeted advertising purposes.

70.     When users share their personal information with financial services, they expect this information to be kept confidential.  Moreover, when consumers seek a specific service from financial websites, they also expect the highly sensitive information they provide on their applications to be kept confidential.

71.     Through the above-listed LinkedIn tracking services, which the Defendant used via the software code installed, integrated and embedded into the Website, the Defendant disclosed its applicants' legally protected information.

72.     Defendant engages in this deceptive conduct for its own profit at the expense of its customers' privacy.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

## CLASS ALLEGATIONS

73.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Class:** All natural persons in the United States who, during the class period, maintained a LinkedIn account and applied for a credit card or loan on the Website.

> **California Subclass:** All natural persons in the State of California who, during the class period, maintained a LinkedIn account and applied for a credit card or loan on the Website.

74.     Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    25

75. The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

76. **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's and LinkedIn's records.

77. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the ECPA, the CIPA §§ 631 and 632, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

78. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the

Website and had his confidential electronic communications intercepted and disclosed to LinkedIn through LinkedIn's Insight Tag.

79. **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

80. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511, *et seq.***

81. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    27

82.   Plaintiff brings this claim on behalf of himself and members of the Class.

83.   The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

84.   The ECPA protects both sending and the receipt of communications.

85.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

86.   The transmission of Plaintiff's PII and financial information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

87.   The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

88.   The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

89.   The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

90.   The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

91. The following instruments constitute "devices" within the meaning of the ECPA:

    a. The computer codes and programs Defendant and LinkedIn used to track Plaintiff and Class Members communications while they were navigating the Website;

    b. Plaintiff's and Class Members' browsers;

    c. Plaintiff's and Class Members' mobile devices;

    d. Defendant's and LinkedIn's web and ad servers;

    e. The plan the Defendant and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

92. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

93. By utilizing and embedding the tracking technology provided by LinkedIn on its website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

94. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by LinkedIn on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to LinkedIn.

95. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific financial product they were applying for, as well as information related to their citizenship, application, and housing status. This confidential information is then monetized for targeted advertising purposes, among other things.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED      29

96. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to LinkedIn through the LinkedIn Insight Tag, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

97. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

98. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

99. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party. GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    30

institution otherwise obtains about a consumer in connection with providing a financial product or service.[32]

100.   Plaintiff's information that Defendant disclosed to LinkedIn qualifies as nonpublic personal information (including information related to their citizenship, application, and housing status), and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313.  Defendant specifically used the tracking technology provided by LinkedIn to track and utilize Plaintiff's and Class Members' PII for financial gain.

101.   Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

102.   Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to LinkedIn without their knowledge or consent.

103.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

104.   As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

105.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

---

[32] 16 C.F.R. § 313

106. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

107. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED 32

108. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

109. The LinkedIn Insight Tag is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

110. LinkedIn is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, LinkedIn has the capability to use and do use the wiretapped information for its own purposes. Accordingly, LinkedIn is a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

111. At all relevant times, LinkedIn willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and members of the California Subclass, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

112. At all relevant times, LinkedIn used or attempted to use the communications intercepted to, *inter alia*, monitor and improve their products and services.

113. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled LinkedIn to wiretap Plaintiff and members of the

California Subclass through the LinkedIn Insight Tag and to accomplish the wrongful conduct at issue here.

114. Plaintiff and members of the California Subclass did not provide their prior consent LinkedIn's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass members' electronic communications. Nor did Plaintiff and California Subclass members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling LinkedIn's conduct.

115. The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the Website and where the LinkedIn Insight Tag—as enabled by Defendant—routed Plaintiff's and California Subclass members' electronic communications to its servers.

116. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 632**

117. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

118. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

119. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    34

or by means of a telegraph, telephone, or other device, except a radio.

120. The LinkedIn Insight Tag is an "electronic amplifying or recording device."

121. Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i)    Personally identifiable financial information; and

(ii)   Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

122. Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)    A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)   About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii)  [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(B)    Account balance information, **payment history**, overdraft history, and credit or debit card purchase information;

(C)    The fact that an individual is or has been one of [a financial institution's] customers or **has obtained a financial product or service** from [a financial institution];

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    35

(D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that **indicates that the individual is or has been [a financial institution's] consumer**;

(E)    Any information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account;

(F)    Any **information [a financial institution] collect[s] through an Internet "cookie"** (an information collecting device from a web server); and

123.    Pursuant to Cal. Fin. Code § 4052(a):

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

124.    Pursuant to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(2)    Account balance information, payment history, overdraft history, and credit or debit card purchase information.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                      36

(3)    The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)    Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)    Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6)    Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

125.    "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

126.    Thus, Plaintiff's and California Subclass members' "nonpublic personal information" is confidential, under federal and California law.

127.    At all relevant times, Defendant assisted LinkedIn in eavesdropping upon and recording such confidential communications of Plaintiff and California Subclass members, on the one hand, and Defendant, on the other.

128.    When communicating with Defendant, Plaintiff and California Subclass members had an objectively reasonable expectation of privacy, based on the GLBA and CalFIPA.  Thus, Plaintiff and California Subclass members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities (like LinkedIn), would intentionally use an electronic amplifying or recording device to eavesdrop upon and

record the confidential communications of Plaintiff and California Subclass members.

129.   Plaintiff and California Subclass members did not consent to any of LinkedIn's actions.  Nor have Plaintiff or California Subclass members consented to any of LinkedIn's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and California Subclass members.

130.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT IV
### Invasion of Privacy Under California's Constitution

131.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

132.   Plaintiff brings this claim on behalf of himself and members of the California Subclass against Defendant.

133.   The highly sensitive and personal information of Plaintiff and California Subclass members consists of private and confidential facts and information regarding Plaintiff's and California Subclass members' financial services that were never intended to be shared beyond private communications on the Website and the consideration of finance professionals.

134.   Plaintiff and California Subclass members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third Parties, such as LinkedIn.

135.   Defendant owed a duty to Plaintiff and California Subclass members to keep their PII confidential.

136.   Defendant's unauthorized disclosure of Plaintiff's and California Subclass members' PII to LinkedIn, one of the world's largest technology and marketing companies, is highly offensive to a reasonable person.

137.   Defendant's willful and intentional disclosure of Plaintiff's and California Subclass members' PII constitutes an intentional interference with Plaintiff's and California Subclass members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

138.   Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and California Subclass members' privacy because Defendant facilitated LinkedIn's simultaneous eavesdropping and wiretapping of confidential communications.

139.   Defendant failed to protect Plaintiff's and California Subclass members' PII and financial information and acted knowingly when it installed the tracking technology onto the Website because the purpose of said technology is to track and disseminate users' communications on the Website for marketing and advertising.

140.   Because Defendant intentionally and willfully incorporated the tracking technology onto the Website and encouraged individuals to use and interact with the Website and the services thereon, Defendant had notice and knew that this practice would cause injury to Plaintiff and the California Subclass.

141.   As a proximate result of Defendant's acts and omissions, the PII and financial information of Plaintiff and California Subclass members was disclosed to LinkedIn, causing Plaintiff and the California Subclass to suffer damages.

142.   Plaintiff, on behalf of himself and California Subclass members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

143. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the California Subclass since their PII and financial information is still maintained by Defendant and is still in the possession of LinkedIn, and the wrongful disclosure of this information cannot be undone.

144. Plaintiff and California Subclass members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third party's continued possession of their sensitive and confidential information. A judgment for monetary damages will not undo Defendant's disclosure of the information to unauthorized third party who, upon information and belief, continue to possess and utilize the information.

145. Plaintiff, on behalf of himself and California Subclass members, further seeks injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and California Subclass members' PII and financial information and to adhere to its common law, contractual, statutory and regulatory duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED 40

(f)  For an order of restitution and all other forms of equitable monetary relief;

(g)  For injunctive relief as pleaded or as the Court may deem proper; and

(h)  For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  October 20, 2025                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By:   */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*